# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF MICHIGAN

| | |
|---|---|
| JEREMY PERDUE, Individually and on Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br>  vs.<br><br>FCA US LLC, f/k/a Chrysler Group LLC, a Delaware corporation, and CUMMINS INC., an Indiana corporation,<br><br>     Defendants. | Civ. No.<br><br>CLASS ACTION COMPLAINT<br><br>JURY DEMAND |

Plaintiff Jeremy Perdue, individually and on behalf of all others similarly situated (the "Class"), alleges the following based on personal knowledge as to himself and upon information and belief and the investigation of his counsel as to all other matters, brings this class action against Defendants FCA US LLC, f/k/a Chrysler Group LLC ("Chrysler"), and Cummins Inc., ("Cummins") (together, "Defendants"), and alleges as follows:

## I.      INTRODUCTION

1.      As the world now knows, Volkswagen, with the participation of its loyal supplier, Bosch, successfully conspired for years to defraud environmental regulators and consumers into believing that their "clean diesel" vehicles were, in fact, clean. However, this scheme eventually unraveled when it was revealed that Volkswagen installed a "defeat device" – a vehicle component designed to cheat emissions testing – to allow its vehicles to unlawfully pass emissions tests while emitting $NO_X$[1] at levels far in excess of legal limits.  As a result of its fraud, Volkswagen has already paid over $15 billion to compensate consumers and remediate the environmental harm it caused.  Yet, claims against Volkswagen and its supplier, Bosch, stemming from the fraud remain.

---

[1]      $NO_X$ is a generic term for nitrogen oxides, which are produced from the reaction of nitrogen and oxygen gases in the air during combustion.

2.    Volkswagen and Bosch elected to use a defeat device because of a simple reality: diesel technology is complicated, expensive, and difficult to effectively calibrate.  These challenges are offset by the numerous advantages of diesel engines, such as increased fuel efficiency, superior performance, and increased component durability, meaning that a company able to overcome the challenges associated with diesel pollutants could produce a vehicle that far exceeds the performance of a conventional gasoline vehicle.  Volkswagen and Bosch engineers failed to accomplish this engineering feat, and elected to employ a defeat device to cheat, instead.  Alas, these companies were not alone.

3.    On January 23, 2007, Cummins announced the development of the 2007 Cummins Turbo Diesel, a 6.7-liter engine used exclusively in Dodge Ram 2500 and 3500 Heavy Duty pickup trucks.[2]  In lauding the engine, Cummins proclaimed that the engine was the "strongest, cleanest, quietest [and] best-in-class," which had met the Environmental Protection Agency's ("EPA") 2010 clean diesel standards years ahead of time.

4.    However, unbeknownst to regulators, consumers, and the Class, Defendants did not release clean vehicles to the market that comply with

---

[2]   Exhibit 1, Cummins Inc.'s Jan. 23, 2007 Press Release, *available at* http://investor.cummins.com/ phoenix.zhtml?c=112916&p=irol-newsArticle_pf&ID=953050.

environmental regulations.  Instead, these vehicles were equipped with low cost, less effective emission reduction technology, which results in $NO_X$ emissions greatly in excess of legal limits, all while reducing fuel economy and component reliability.  In fact, the legal limit of $NO_X$ emissions for stop-and-go driving is 200 mg/mile.  When tested, Dodge Ram 2500s emitted 702 mg/mile on average, and 2,826 mg/mile at its maximum level of emissions output.  The California (and other states that have adopted the California standard pursuant to Section 177 of the Clean Air Act) $NO_X$ limit for highway conditions is 400 mg/mile, and testing for the Dodge Ram 2500 shows an average of 756 mg/mile, and 2,252 mg/mile at its maximum level of emissions output.

5.      That these vehicles were able to pass applicable emissions tests is telling: these vehicles were capable of detecting testing scenarios and able to ensure legal emissions during those tests, while emitting $NO_X$ greatly in excess of legal limits during normal driving conditions.  The ability to differentiate between these driving scenarios, and adjust emissions accordingly, is predicated on the use of an illegal defeat device.

6.      Plaintiff and the Class are consumers who purchased or leased a vehicle containing a defective diesel engine system with a defeat device and/or other auxiliary emissions control devices, including but not limited to: the 2007–2010 Dodge Ram 2500 with a Cummins diesel engine, the 2011–2012 Dodge Ram 2500 with a

Cummins diesel engine (non-SCR system), the 2007–2010 Dodge Ram 3500 with a Cummins diesel engine, and the 2011–2012 Dodge Ram 3500 with a Cummins diesel engine (non-SCR system) (collectively, the "Defective Vehicles"). These Defective Vehicles were authorized for sale by the EPA and state agencies based on Defendants' deceptive use of a defeat device, and Plaintiff and the Class relied on Defendants' representations that the Defective Vehicles were, in fact, legal to purchase and own.

7.     Plaintiff, for himself and all others similarly situated, hereby brings this action for violations of the Racketeer Influenced & Corrupt Organizations Act (18 U.S.C. §1961, *et seq.* ("RICO")); violation of the Magnuson-Moss Warranty Act (15 U.S.C. §2301, *et seq.* ("MMWA")); fraud by concealment; breach of contract; violation of Michigan's express warranty statute (MICH. COMP. LAWS §440.2323); violation of Michigan's implied warranty statute (MICH. COMP. LAWS §440.2314); violation of the Michigan Consumer Protection Act (MICH. COMP. LAWS §445.901, *et seq.*); violation of North Carolina's express warranty statute (N.C.G.S.A. §§25-2-313 and 252A-210); violation of North Carolina's implied warranty statute (N.C.G.S.A. §§25-2-314 AND 252A-212); and violation of the North Carolina Deceptive and Unfair Trade Practices Act (N.C. Gen. Stat. §75-1.1, *et seq.*).

8.     Defendants' wrongful and illegal acts show a deliberate disregard for the rights or safety of the public. Defendants had knowledge of facts and/or intentionally disregarded facts that created a high probability of injury to the rights or safety of

others, yet Defendants deliberately proceeded to act in conscious or intentional disregard of, and with reckless indifference to, the high degree of probability of injury to the rights or safety of others. Defendants' conduct entitles Plaintiff and the Class to a significant award of punitive or exemplary damages in this case.

9.    Plaintiff seeks, on behalf of himself and Class members nationwide, monetary damages (including treble damages under the RICO statute), appropriate restitution, injunctive relief, and all other relief deemed appropriate, arising out of Defendants' illegal scheme and conspiracy alleged herein.

## II.    JURISDICTION AND VENUE

10.    This Court has jurisdiction over this action pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §1332(d), because at least one Class member is of diverse citizenship from one Defendant, there are more than 100 Class members, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest, and costs. Subject-matter jurisdiction also arises under 28 U.S.C. §1331 based upon the federal RICO claims asserted under 18 U.S.C. §1961, *et seq.* and the Magnuson-Moss Warranty Act claims asserted under 15 U.S.C. §2301, *et seq.* This Court also has supplemental jurisdiction over the state law claims alleged herein pursuant to 28 U.S.C. §1367.

11.    The Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. §§1965(b) and (d). In addition, the Court has jurisdiction over Defendants

- 5 -

because they are registered to conduct business in Michigan; have sufficient minimum contacts in Michigan; and intentionally avail themselves of the markets within Michigan through the promotion, sale, marketing, and distribution of its vehicles, including the Defective Vehicles, to render the exercise of jurisdiction by this Court proper and necessary. Defendants' wrongful conduct (as described herein) foreseeably affects consumers in Michigan. Moreover, Chrysler's principal place of business and headquarters is in Auburn Hills, Michigan, in the Eastern District of Michigan.

12.     Pursuant to 28 U.S.C. §1391(b), venue is proper in this District because a substantial part of the events or omissions giving rise to the claims occurred in this District, and Defendants have also marketed, advertised, sold, and leased the Defective Vehicles containing defeat devices in this District. Moreover, Chrysler's principal place of business is in this District.

## III.   PARTIES

13.     Plaintiff Jeremy Perdue is a resident of Asheboro, North Carolina. On or about July 10, 2014, Plaintiff purchased a 2009 Dodge Ram 2500 truck from Smart Chevrolet and Body Shop in Madison, North Carolina. As a resident of Asheboro, North Carolina, Plaintiff was required to take all registered vehicles to a local emissions testing center for testing. Only vehicles that passed the emissions inspection test are allowed to be registered. Thus, it was critically important to

Plaintiff that his vehicle comply with all local, state and federal emissions regulations so that it could pass all required tests and become legally registered.

14.     Before purchasing the Defective Vehicle, Plaintiff read about and researched its traits; Plaintiff was induced to purchase a Defective Vehicle after learning of diesel vehicles' fuel efficiency and improved performance, as well as their reputation for maintaining a high resale value. Additionally, Plaintiff believed at the time of purchase that the vehicle was compliant with all local, state, and federal emissions regulations – and that it would pass all required emissions testing. If there had been any question as to the Defective Vehicle's ability to pass emissions inspections, or otherwise not comply with local, state, or federal regulations at the time of the sale, then Plaintiff would not have purchased it.

15.     Unbeknownst to Plaintiff, at the time of acquisition, the Defective Vehicle contained a defeat device designed to bypass emission standards and deceive consumers and regulators. Consequently, the Defective Vehicle could not deliver the promised combination of low emissions, high performance, and fuel economy—and was illegal. Plaintiff has suffered concrete injury as a direct and proximate result of Defendants' conduct, and would not have purchased the Defective Vehicle had Defendants not concealed the illegal defeat device and the unlawfully high NOX emissions.

16.     Defendant Chrysler is a limited liability company organized under the laws of the State of Delaware, with its principal place of business and headquarters in Auburn Hills, Michigan.  Chrysler is wholly owned by Fiat Chrysler Automobiles N.V. ("Fiat"), a Dutch corporation headquartered in London, United Kingdom.  The American brands in the Chrysler family include Chrysler, Dodge, Jeep, RAM, Fiat, Alfa Romeo, Mopar, and SRT.  Chrysler conducts substantial business in the Eastern District of Michigan and elsewhere throughout the United States.

17.     Chrysler's business operations in the United States consist of the manufacture, distribution, and sale of motor vehicles, including the Defective Vehicles, and parts through its network of independent, franchised motor vehicle dealers.  Chrysler is engaged in interstate commerce in that it sells vehicles through this network located in all fifty States, and distributes and develops owner's manuals, warranties, and promotional materials throughout the United States.

18.     Cummins Inc. is a publicly-traded company that designs, manufactures, sells and services diesel and alternative fuel engines and their related components and technology.  Cummins Inc. is headquartered in Columbus, Indiana, and owns a network of 600 company-owned and independent distributor facilities and more than 7,200 dealer locations in over 190 countries and territories.

## IV.   FACTUAL ALLEGATIONS

### A.   Defendants' Illegal Scheme Is Hatched for Chrysler's Diesel Engines

#### 1.   The Challenges and Benefits to Diesel Engines

19.   Many may view diesel engines as a relic of the past, where vehicles would emit thick, toxic smoke full of dangerous and destructive pollutants.  However, diesel technology has reportedly improved so significantly that it is now viewed as a "green" alternative to the standard gasoline automobile, oftentimes grouped with electric and hydrogen cell vehicles.[3]

20.   Diesel vehicles use diesel fuel instead of standard gasoline, and ignite the fuel through a combination of high temperatures and high compression within the engine, as opposed to a spark ignition in the typical automobile engine.  Diesel fuel is traditionally much denser than gasoline, and the high density fuel mixed with higher operating temperatures tends to produce a more efficient vehicle; gasoline engines are typically 30% efficient at converting fuel into energy, while diesel engines can convert well over 45% of fuel energy into useful mechanical energy.[4]

---

[3]   Exhibit   2,   http://www.fool.com/investing/general/2015/02/22/clean-diesel-hydrogen-fuel-cell-or-electric-volksw.aspx (last visited Nov. 17, 2016).

[4]   Exhibit 3,
http://www1.eere.energy.gov/vehiclesandfuels/pdfs/basics/jtb_diesel_engine.pdf
(last visited Nov. 17, 2016).

21.     Diesel engines exist in a state of balance between rich and lean states. A diesel engine in a rich state contains more fuel than air, which tends to produce higher amounts of pollutant soot and reduced fuel efficiency. On the other hand, the lean state contains more air than fuel and produces higher amounts of $NO_X$. Neither of these discharges is desirable, as soot is rich in hazardous hydrocarbons and dangerous to lungs and hearts, while $NO_X$ – which can travel hundreds of miles from the source of emission – has a particularly destructive effect on the ozone layer.

22.     In order for the EPA to designate a diesel automobile as a "clean" vehicle, it must produce both low soot and low $NO_X$. Since achieving that is a difficult feat, significant engineering and innovation are required to achieve a clean rating. Typically, this involves running the diesel engine in a highly compressed, lean state to maximize fuel efficiency, countering soot production with diesel particulate filters and controlling the $NO_X$.

23.     To reduce $NO_X$ emissions, diesel manufacturers were typically presented with two options: selective catalytic reduction, or use of a lean $NO_X$ trap. Selective catalytic reduction involves injecting urea into a diesel vehicle's exhaust stream to react with the $NO_X$, thereby turning it into harmless nitrogen and oxygen. This approach is quite effective, but it requires expensive, relatively bulky equipment to be added to the vehicle. Defendants sought to avoid this by using a lean $NO_X$ trap (also called a $NO_X$ adsorber), which involved the storage of $NO_X$ in a separate compartment

- 10 -

during vehicle operation.  When the compartment is full, the system then burns off the stored $NO_X$ by pumping an extra burst of fuel into the cylinders, most of which passes through to the converter where it burns the $NO_X$ into harmless nitrogen and oxygen. This method is relatively cheaper and easier to implement than selective catalytic reduction, but results in lower fuel efficiency and, as evidenced by Volkswagen's diesel scandal – involving a category of vehicles employing similar technology – this technology is potentially less effective at $NO_X$ reduction.

24.     The $NO_X$ trap technology requires coordination with the vehicle's computer – its engine control unit ("ECU") – which monitors and controls the operation of the storage and reduction phases of the $NO_X$ trap, necessary to the emissions control system.  The ECU also monitors the diesel particulate filter ("DPF"), which traps and oxidizes soot generated during a rich state of engine operation.

### 2.     Defendants' History of Diesel Vehicles

25.     Both Chrysler and Cummins have a long, but checkered, history with diesel vehicles.

26.     Dodge's diesel vehicles debuted in 1939, featuring engines that were designed in-house as the power behind 28 different truck models.  During World War II, Chrysler and Dodge focused on developments for the war effort, causing diesel

vehicle development to stall until the 1959 debut of Dodge's new heavy-duty trucks, powered by Cummins diesel engines.

27.     Decades later, in 1989, Cummins and Chrysler again partnered for the release of Dodge Ram Cummins Turbo Diesel pickup trucks, "a surprise hit for the company."[5]  The next year, in 1990, the EPA amended its air pollution standards under the Clean Air Act, which addressed diesel emissions.  Over the following ten years, Chrysler and Cummins continued to develop incremental enhancements to the diesel pickup line, doubling horsepower and torque for the heavy-duty pickup trucks while attempting to meet EPA emissions standards.

28.     These attempts were not always successful; in 1998, the Department of Justice, on behalf of the EPA, sued Cummins, along with every other diesel manufacturer in the United States, for installing defeat devices in their engines.[6]  Pursuant to a consent decree, these defendants agreed to pay over $1 billion to fix the defective engines, along with an $83.4 million civil penalty.[7]  Further, in 2010, due to

---

[5]   Exhibit 4, http://www.cheatsheet.com/automobiles/8-cars-that-tell-the-history-of-diesel-in-the-u-s.html/?a=viewall.

[6]   Exhibit 5,  https://www.epa.gov/enforcement/detroit-diesel-corporation-diesel-engine-settlement.

[7]   Exhibit 6, https://www.justice.gov/archive/opa/pr/1998/June/281.html.

Cummins' noncompliance with the consent order, Cummins agreed to an additional $2.1 million payment for continuing to ship out defective engines.[8]

29.     In the midst of the U.S. diesel industry's defeat device scandal, the EPA was simultaneously instituting increasingly tougher emissions standards to take effect in 2004, 2007, and 2010, causing great consternation in the diesel industry.  However, Cummins and Chrysler proclaimed that their latest collaboration would meet, and exceed, these onerous standards when Cummins unveiled its 6.7-liter Turbo Diesel engine.[9]

### 3.     Defendants Unveil Their Clean Diesel Technology

30.     In September 2006, Cummins unveiled its 6.7-liter Turbo Diesel engine, proclaiming it to be a "Cleaner, Quieter and More Powerful" engine[10] capable of meeting 2010 EPA emissions standards years ahead of their release.[11]  This release

---

[8]   Exhibit 7, https://www.justice.gov/opa/pr/cummins-inc-agrees-pay-21-million-penalty-diesel-engine-clean-air-act-violations.

[9]   Exhibit 8, http://investor.cummins.com/phoenix.zhtml?c=112916&p=irol-newsArticle_pf&ID= 953050.

[10]   Exhibit 9, http://www.prnewswire.com/news-releases/dodge-introduces-cleaner-quieter-and-more-powerful-67-liter-cummins-turbo-diesel-engine-at-state-fair-of-texas-57203457.html.

[11]   Exhibit 10, http://www.pickuptrucks.com/html/news/cleanramdiesels.html.

was part of its ongoing mission "to demand that everything we do lead to a cleaner, healthier, safer environment."[12]

31.    More specifically, and according to a company press release:

Cummins engineers determined that certifying the Dodge Ram pickup truck to the 0.2 g/mi 2010 NOx emission standard early would provide Cummins with significant commercial and technical advantages. Achieving these stringent emission standards required engineers to reduce particulate and NOx emissions by more than 90 percent. This catalyst system was used in more than 450,000 Chrysler ISB engines from 2007 to 2013. The EPA credits generated by this technology allowed Cummins' teams to focus on hitting the next round of emissions standards for other engine platforms, and allowed the company to avoid interim emissions phase-ins. As a result, Cummins increased its heavy duty market share and gained the market share lead in 2007. Today, the company maintains that lead with 41.5 percent of Class 8 vehicles, and 62.5 percent of Class 6 and 7 vehicles.[13]

32.    Chrysler touted the Defective Vehicles as "the cleanest and best-performing heavy-duty pickup truck in the market," which made use of "Breakthrough emissions technology" that resulted in "Nitrogen oxide ($NO_X$) emissions reduced by as much as 90 percent."[14]

33.    The purported success of the engine prompted awards from the automotive press.  In accepting an award from *Automotive News*, Joe Loughrey,

---

[12]   Exhibit 11, Cummins Inc.'s 2007 Sustainability Report at 34, *available at* https://www.cummins.com/
sites/default/files/sustainability/2007_Sustainability _Report_FINAL.pdf.

[13]   Exhibit 12, http://social.cummins.com/making-cummins-stronger-innovation/.

[14]   *Id.*

President and Chief Operating Officer of Cummins, proclaimed: "This is a significant product innovation and a terrific honor for Cummins to be recognized. We share this recognition with our customer, Chrysler, who collaborated with us in developing a common vision for a product that would deliver on our commitment to exceptional customer satisfaction while ensuring our contribution to a cleaner environment."[15]

34.     Chrysler enthusiastically touted the clean (and legal) nature of the Defective Vehicles in advertisements to the public, including various brochures:

**a.     2008 Brochure for Ram 2500/3500 Trucks**

35.     "THE CUMMINS® 6.7-LITER TURBO DIESEL. SO GOOD, SO POWERFUL, AND SO CLEAN IT WARRANTS A CLASS OF ITS OWN – AND IT'S ONLY IN A DODGE RAM HEAVY DUTY."[16]

36.     "The most recent example of the world-famous Cummins powerplant [sic] continues the Cummins history with Dodge Ram—a legacy of pure, driven truck power taking advantage of an increasingly popular—and today, surprisingly clean— fuel source."[17]

---

[15]  Exhibit 13, Cummins Inc.'s Apr. 15, 2008 Press Release, *available at* http:// investor.cummins.com/phoenix.zhtml?c=112916&p=irol-newsArticle_Print&ID= 1129865.

[16]  Exhibit 14, 2008 Dodge Ram brochure at 11, *available at* http://www.auto-brochures.com/makes/ram/Ram_US%20HD_2008.pdf (emphasis in original throughout).

[17]  *Id.*

37.    "The large piston bowl is another engineering technique used to ensure good power and clean emissions. In fact, based on full-size diesel pickup trucks, the Cummins offers the cleanest diesel emissions of any."[18]

38.    "ADVANCED REQUIREMENTS MET TODAY. The particulate filter is profoundly effective, and is a major factor in Cummins diesel emissions reduction Ram 2500 and 3500 pickup models. Reduced emissions are so important, the 6.7-liter is already able to meet the stringent truck emissions standards based on future requirements—for the 2010 model year. And it meets them in all 50 states."[19]

**b.    2009 Brochure for Ram 2500/3500 Trucks**

39.    "THE INCREDIBLE CUMMINS 6.7-LITER TURBO DIESEL. SO POWERFUL, IT DROPS THE COMPETITTION WITH A ONE-TWO-THREE PUNCH OF 650* LB-FT OF TORQUE, 350 HORSEPOWER, AND SQUEAKYCLEAN EMISSIONS."[20]

40.    "THE CUMMINS® 6.7-LITER TURBO DIESEL: A CLEAN BREAK FROM OTHER DIESELS. Cummins and Dodge Ram form a team that results in outstanding reliability. . . . The Cummins 6.7-liter now ranks among the cleanest of

---

[18]    *Id.*

[19]    *Id.*

[20]    Exhibit 15, 2009 Dodge Ram brochure at 4, *available at* http://www.auto-brochures.com/makes/ram/Ram_US%20HD_2009.pdf.

any full-size pickup diesel engine. Emissions are so low, they currently meet 2010 emissions regulations."[21]

### c.      2010 Brochure for Ram 2500/3500 Trucks

41.     "THE DRIVING FORCE BEHIND MANY RAM HEAVY DUTY MODELS:  THE SINGULAR 6.7-LITER CUMMINS® TURBO DIESEL. By any measure, it's got game. . . . As one of the cleanest, most powerful, and most respected diesel engines in any commercial pickup, this remarkable power plant can power significantly larger-class vehicles."[22]

### d.      2011 Brochure for Ram 2500/3500 Trucks

42.     "CUMMINS. THE QUIET AUTHORITY IN CHARGE OF DIESEL POWER.  This is teamwork that just flat-out works. Ram Heavy Duty pickups and the formidable Cummins Turbo Diesel are a partnership of shared strengths—for this is a relationship that goes back decades while constantly looking forward to the next generation of trucks. The Cummins 6.7-liter workhorse is capable of driving much larger vehicles—part of the reason it works so well in Ram Heavy Duty pickups. Boasting quiet and clean performance, the Cummins generates between 610 and 650

---

[21] *Id.*

[22] Exhibit 16, 2010 Dodge Ram brochure at 6, *available at* http://www.auto-brochures.com/makes/ram/Ram_US%20HD_2010.pdf.

lb-ft of torque (at only 1,500 rpm) and 350 horsepower, depending on transmission, meeting virtually every need for towing, hauling, and responsive acceleration."[23]

43.     "The Cummins 6.7-liter Turbo Diesel in Ram Heavy Duty is the only one in its class to meet all 50-state emissions standards—with no need for DEF—resulting in impressive savings in time, costs and hassles."[24]

44.     "FUEL FILTER: A WORKING MODEL OF EFFICIENCY. There is little doubt that diesel will play an increasingly important role for both truck and car propulsion. Diesel engines today are a model of cleanliness—in part, due to the fuel filter. The Cummins Turbo Diesel features a fuel filter with outstanding efficiency."[25]

### e.     2012 Brochure for Ram 2500/3500 Trucks

45.     "Diesel engines today are a model of cleanliness—in part, due to the fuel filter. The Cummins Turbo Diesel features a fuel filter with outstanding efficiency."[26]

46.     Referring to quality control testing: "Long before they work for you, Ram Heavy Duty prototypes endure conditions unlikely to be encountered in your

---

[23]  Exhibit 17, 2011 Dodge Ram brochure at 8, *available at* http://www.auto-brochures.com/makes/ram/Ram_US%20HD_2011.pdf.

[24]  *Id.*

[25]  *Id.*

[26]  Exhibit 18, 2012 Dodge Ram brochure at 3, *available at* http://www.auto-brochures.com/makes/
ram/Ram_US%20HD_2012.pdf.

life—or lifetime. Grueling durability tests, excessive climate testing, road simulation shake trials on tracks that resemble mountainous terrains—it's beyond brutal. We measure every number—and we measure up, backing you with one of the best working warranties in the business."[27]

### B.   Defendants' Illegal Scheme Is Revealed

47.   Following the revelation of Volkswagen and Bosch's diesel emissions fraud, regulators across the globe were left scrambling to determine how they were deceived, and how widespread the problem of emissions fraud truly was.  For example, the Dutch Ministry of Infrastructure and the Environment released a study in May 2015 that found that all sixteen vehicles made by a variety of manufacturers, when tested, emitted significantly more $NO_X$ in real world driving than the levels recorded in laboratory tests, such that "[i]n most circumstances arising in normal situations on the road, the system scarcely succeed in any effective reduction of $NO_X$ emissions."[28]  Of course, this conclusion directly contradicted the public statements Defendants made about the emission reduction technology in the Defective Vehicles.

---

[27]  *Id.* at 6.

[28]  Exhibit 19, *Detailed investigations and real-world emission performance of Euro 6 diesel passenger cars*, TNO (May 18, 2015) at 6, *available at* http://publications.tno.nl/publication/34617056/4QHNNo/ TNO-2015-R10838.pdf.

48.     Additionally, Chrysler has initiated a recall of 2013-2015 Dodge Ram 2500s equipped with 6.7L Cummins diesel engines because of the propensity of their $NO_X$ emissions systems to fail and cause the vehicles to emit excess $NO_X$ emissions.[29] This recall has been estimated to cost $200 million to fix the illegally high emissions associated with some 130,000 vehicles – a recall that is estimated to reduce fuel economy for those vehicles.

49.     Accordingly, testing was performed by co-counsel's expert,  on a 2012 Dodge Ram 2500 powered by a Cummins 6.7 diesel engine using a portable emission measurement system ("PEMS"). The vehicle had recorded mileage of approximately 70,000 miles at the time of testing.  The results of the PEMS testing show that the vehicle does not meet the relevant emission standards, as follows:

(a)     During on-road testing designed to simulate the driving profile of the Federal Test Procedure ("FTP") certification cycle, emissions were found to be 702 mg/mile on average, 3.5 times the federal and California standard of 200 mg/mile.

(b)     Over significant distances, emissions were found to be as high as 1,100 to 2,800 mg/mile for periods lasting as long as 21% of the total drive time, or between 5.5 to 14 times the relevant standard.

---

[29]  Exhibit  20,  http://www.reuters.com/article/us-fiat-chrysler-cummins-lawsuit-idUSKCN12A2LD.

(c)     During on-road PEMS testing designed to simulate the driving profile of the Highway certification cycle, average emissions were found to be 756 mg/mile, or 1.9 times the California standard (and other "Section 177" states).

(d)     Over significant distances, emissions were found to be as high as 1,200 to 2,250 mg/mile for periods lasting as long as 16% of the total drive time, or 3.0 to 5.6 times the relevant standard.

50.     The Dodge Ram was also found to be particularly sensitive to hills, where steady speed emissions could spike as high as 2,100 mg/mile, 5.5 times the standard, on a steady 1.5% grade.

51.     The excess emissions are believed to result from excessive DPF active regeneration in combination with a deactivated $NO_X$ adsorber catalyst. The need for excessive DPF regeneration events and lower overall activity of the $NO_X$ adsorber catalyst also lead to increased fuel consumption, reducing overall fuel economy of the vehicle by 3%-4%, and shortened engine component life.

52.     The Cummins engine certification requires on-board diagnostics that must be able to monitor $NO_X$ levels at all times.  If the $NO_X$ levels exceed certain limits, service lights and potential engine derate strategies are required to be deployed to motivate the operator to have the vehicle inspected and/or serviced, thereby returning $NO_X$ levels to their legal limits.  However, despite the elevated $NO_X$ levels

observed above, *at no time during the testing were any diagnostic indicators or engine derating observed*.

53.    These test results are consistent with those found by researchers who prepared the "CAFEE Report" that led to the uncovering of the Volkswagen scandal. There, researchers from West Virginia University studied the emissions performance of a $NO_X$ adsorber-equipped passenger car during DPF regeneration. Testing revealed that during regeneration events, there was an increase in $NO_X$ emissions by 97%. The authors also found particulate matter was found to exceed the European standards during DPF regeneration events by two to three orders of magnitude.

## C.    Defendants' Illegal Scheme to Obtain Fraudulent EPA Certificates of Conformity for Sale of the Defective Vehicles

54.    The EPA administers a certification program to ensure that every vehicle introduced into U.S. commerce satisfies applicable emissions standards, and issues certificates of conformity to vehicles that satisfy the emissions standards for certain pollutants.

55.    To obtain a certificate of conformity ("COC") and thereby be allowed to introduce a vehicle into U.S. commerce, a vehicle manufacturer, such as Chrysler, must submit an application to the EPA that includes a list of all auxiliary emission control devices installed on the vehicles, a justification for each, and a rationale for why the control device is not a defeat device.

56.   A defeat device is defined as an auxiliary emission control device "that reduces the effectiveness of the emission control system under conditions which may reasonably be expected to be encountered in normal vehicle operation."  40 C.F.R. §86.1803-01.  As made clear by federal regulations:  "No new light-duty vehicle, light-duty truck, medium-duty passenger vehicle, or complete heavy-duty vehicle shall be equipped with a defeat device." *Id.*, §86.1809-10.  Thus, motor vehicles that contain a defeat device cannot be certified, or sold, in the United States.

57.   Chrysler, however, installed defective clean diesel engine systems containing a defeat device in the Defective Vehicles, but did not disclose the presence of the defective engine system or defeat device to the EPA or to the consuming public, and instead intentionally and fraudulently misrepresented the amount of emissions released by the Defective Vehicles in normal vehicle operation.  This enabled Chrysler to circumvent EPA regulation and fraudulently pass EPA tests, and then, after the engine detected that the test was over, the engine would return to primary driving mode and its grossly excessive $NO_X$ emissions.

58.   The certificates of conformity issued by the EPA for the Defective Vehicles state: "this certificate covers only those new motor vehicles or vehicle engines which conform, in all material respects, to the design specifications" described in the application for the COC.

59.     Thus, because the defective engine systems and defeat devices were not disclosed in Chrysler's application to the EPA or to the consuming public, the Defective Vehicles are not covered by a valid COC and are not legally permitted to be introduced into U.S. commerce.  Chrysler hid this fact from the EPA, from other government agencies, and from consumers, and has continued to sell and/or lease the Defective Vehicles to the public.

60.     Accordingly, no one would have purchased or leased these vehicles had Defendants come clean about the defeat devices.  That is because Defendants could not obtain a valid COC but-for their fraud in order to introduce the Defective Vehicles into U.S. commerce.

61.     Plaintiff and the Class are currently stuck with Defective Vehicles that emit unlawfully high levels of $NO_X$, and whose ability to enter the stream of commerce is predicated on obtaining COCs and state emissions certifications that were – and still are – fraudulently obtained.  Based on PEMS testing, it is clear that the Defective Vehicles never should have been authorized for sale, and Plaintiff and the Class are now stuck with trucks that are worth a fraction of what Defendants purported.

## V.   CLASS ACTION ALLEGATIONS

62.   Plaintiff brings this action as a class action pursuant to Rule 23(a), (b)(2), and (b)(3) of the Federal Rules of Civil Procedure on behalf of himself and all others similarly situated as members of the classes listed below:

(a)   **The Nationwide Class:**   All persons or entities in the United States who are current or former owners/lessees of a "Defective Vehicle."

(b)   **The Michigan Class:**   All persons or entities in the state of Michigan who are current or former owners/lessees of a "Defective Vehicle."

(c)   **The North Carolina Class:** All persons or entities in the state of North Carolina who are current or former owners/lessees of a "Defective Vehicle."[30]

63.   Specifically excluded from the proposed Classes are individuals who have personal injury claims resulting from the Defective Vehicles, Defendants, their officers, directors, agents, trustees, parents, children, corporations, trusts, representatives, employees, principals, servants, partners, and joint ventures, or entities controlled by Defendants, and their heirs, successors, assigns, or other persons or entities related to or affiliated with Defendants and/or their officers and/or directors, or any of them, any judge assigned to this action, and any member of their immediate family.

---

[30]   The Nationwide Class, Michigan Class, and North Carolina Class are collectively referred to as the "Class."

64.     Subject to additional information obtained through further investigation and discovery, the foregoing Class definition may be expanded or narrowed by amendment or superseded by Plaintiff's motion for class certification.   Plaintiff expressly reserves the right to move for class certification of different state classes and different or additional vehicles.

65.     **Numerosity of the Class**.  The members of the Class are so numerous that their individual joinder is impracticable.  Upon information and belief, Chrysler sold hundreds of thousands of Defective Vehicles.  Plaintiff is informed and believes that there are, accordingly, hundreds of thousands of members in the Class.  Inasmuch as the Class members may be identified through business records regularly maintained by Chrysler and its employees and agents, and through the media, the number and identities of Class members can be ascertained.  Members of the Class can be notified of the pending action by e-mail and mail and supplemented by published notice, if necessary.

66.     **Existence and Predominance of Common Question of Fact and Law**.  There are questions of law and fact common to the Class.   These questions predominate over any questions affecting only individual Class members.   These common legal and factual issues include, but are not limited to:

(a)     whether Defendants engaged in the conduct alleged herein;

(b)     whether the Defective Vehicles contain a defective engine system that does not comply with EPA emission standards;

(c)     whether Defendants violated the RICO statute;

(d)     whether Defendants violated Michigan state law;

(e)     whether Defendants violated North Carolina state law;

(f)     whether Defendants violated the MMWA;

(g)     whether Chrysler breached its warranties;

(h)     whether Defendants violated the common law;

(i)     whether the Defective Vehicles emit more pollution than represented by Chrysler;

(j)     whether the Defective Vehicles emit more pollution than allowed under applicable state and federal law;

(k)     whether the Defective Vehicles can be made to comply with EPA emission standards without sacrificing fuel efficiency or performance;

(l)     whether the Defective Vehicles can be made to comply with representations made by Chrysler;

(m)     whether Chrysler's representations regarding the Defective Vehicles were materially misleading;

(n)     whether Defendants knew of the defective engine system and defeat device in the Defective Vehicles, and if so, how long have Defendants had this knowledge;

(o)     whether Defendants intentionally designed, manufactured, and installed defective engine systems in the Defective Vehicles;

(p)     whether Plaintiff and other Class members overpaid for the Defective Vehicles;

(q)     whether Defendants' conduct violates the laws as set forth in the causes of action;

(r)     whether Defendants' inevitable remedial measures reduce the utility, value, or performance of their Defective Vehicles;

(s)     whether Plaintiff and Class members are entitled to equitable or injunctive relief; and

(t)     whether Plaintiff and Class members are entitled to restitution or damages, and what is the proper measure of these damages.

67.     **Typicality**.  The claims of the representative Plaintiff are typical of the claims of each member of the Class.  Plaintiff, like all other Class members, has sustained damages arising from Defendants' violations of the laws, as alleged herein. The representative Plaintiff and Class members were and are similarly or identically

harmed by the same unlawful, deceptive, unfair, systematic, and pervasive pattern of misconduct engaged in by Defendants.

68.    **Adequacy**.  The representative Plaintiff will fairly and adequately represent and protect the interests of the Class members and has retained counsel who are experienced and competent trial lawyers in complex litigation and class action litigation.  There are no material conflicts between the claims of the representative Plaintiff and the members of the Class that would make class certification inappropriate.  Counsel for the Class will vigorously assert the claims of all Class members.

69.    **Predominance and Superiority**.  This suit may be maintained as a class action under Federal Rule of Civil Procedure 23(b)(3) because questions of law and fact common to the Class predominate over the questions affecting only individual members of the Class, and a class action is superior to other available means for the fair and efficient adjudication of this dispute.  The damages suffered by individual Class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation needed to address Defendants' conduct.  Further, it would be virtually impossible for Class members to individually redress effectively the wrongs done to them.  Even if Class members themselves could afford such individual litigation, the court system could not.  In addition, individualized litigation increases the delay and expense to all parties and to the court

system resulting from complex legal and factual issues of the case.  Individualized litigation also presents a potential for inconsistent or contradictory judgments.  By contrast, the class action device presents far fewer management difficulties; allows the hearing of claims which might otherwise go unaddressed because of the relative expense of bringing individual lawsuits; and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court.

70.     Plaintiff contemplates the eventual issuance of a notice to the proposed Class members setting forth the subject and nature of the instant action.   Upon information and belief, Chrysler's own business records and electronic media can be utilized for the contemplated notices.  To the extent that any further notices may be required, Plaintiff would contemplate the use of additional media and/or mailings.

71.     Additionally, this action is properly maintained as a class action pursuant to Rule 23(b) of the Federal Rules of Civil Procedure, in that:

(a)     without class certification and determination of declaratory, injunctive, statutory, and other legal questions within the class format, prosecution of separate actions by individual members of the Class will create the risk of:

(b)     inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the parties opposing the Class; or

(c)     adjudication with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other Class members not parties to the adjudication or substantially impair or impede their ability to protect their interests;

(d)     the parties opposing the Class have acted or refused to act on grounds generally applicable to each member of the Class, thereby making appropriate final injunctive or corresponding declaratory relief with respect to the Class as a whole; or

(e)     common questions of law and fact exist as to the members of the Class and predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of the controversy, including consideration of:

(i)     the interests of the members of the Class in individually controlling the prosecution or defense of separate actions;

(ii)     the extent and nature of any litigation concerning controversy already commenced by or against members of the Class;

(iii)     the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and

(iv)     the difficulties likely to be encountered in the management of a class action.

- 31 -

72.     Damages may be calculated from the data maintained in Defendants'
records, so that the cost of administering a recovery for the Class can be minimized.
However, the precise amount of damages available to Plaintiff and Class members is
not a barrier to class certification.

## VI.    Tolling of the Statute of Limitations

### A.     Discovery Rule Tolling

73.     Plaintiff and the members of the Class could not have discovered through
the exercise of reasonable diligence that Defendants were concealing and
misrepresenting the Defective Vehicles' emission specifications and that the Defective
Vehicles contained a defeat device rendering the Diesel engine system defective in
violation of federal and state laws within the time period of any applicable statutes of
limitation.

74.     Plaintiff and the other Class members did not know, and could not
reasonably discover, that Defendants intentionally failed to report information within
their knowledge to federal and state authorities, or consumers.

75.     Likewise, a reasonable and diligent investigation could not have
disclosed that Defendants intentionally engaged in emissions deception and that they
concealed that information, which was discovered by Plaintiff shortly before this
action was filed.

76.     In fact, Defendants continue to deny the existence of a defeat device contained in the Defective Vehicles, and maintain that the increased emissions from these vehicles could be attributed to solely innocuous causes.

77.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to claims as to Defective Vehicles.

**B.     Fraudulent Concealment Tolling**

78.     Throughout the time period relevant to this action, Defendants concealed from Plaintiff and the other Class members the defects described herein.  Thus, all applicable statutes of limitation have also been tolled by Defendants' knowing and active fraudulent concealment and denial of the facts alleged herein throughout the time period relevant to this action.

79.     Instead of disclosing its emissions scheme, or that the diesel engine systems contained in the Dodge trucks were defective and resulted in emissions from the Defective Vehicles that were far worse than represented and violated federal and state law, Chrysler falsely represented the Defective Vehicles complied with federal and state emissions standards, and that it was a reputable manufacturer whose representations could be trusted.

80.     Defendants intentionally designed and installed the defeat device to conceal the true amount of pollutants emitted by the Defective Vehicles, and withheld this information for many years.  Only when private testing was conducted was it

revealed that Defective Vehicles contained defective clean diesel engine systems that emitted far more pollutants than permitted under EPA standards and disclosed to the public.

81.    Thus, the running of all applicable statutes of limitation have been suspended with respect to any claims that Plaintiff and the other Class members have incurred by virtue of the fraudulent concealment doctrine.

**C.    Estoppel**

82.    Defendants were under a continuous duty to disclose to Plaintiff and the other Class members the true character, quality, and nature of the Defective Vehicles, including facts that it knew about the Defective Vehicles' clean diesel engine systems and pollutant emissions and the Defective Vehicles' failure to comply with federal and state law.

83.    Defendants knowingly, affirmatively, and actively concealed the true nature, quality, and character of the clean diesel engine systems, the emissions control systems, and the emissions of the Defective Vehicles.

84.    Although Defendants had the duty to disclose to Plaintiff and Class members that they had engaged in the deception described herein and installed defective clean diesel engine systems in the Defective Vehicles, Defendants chose to evade federal and state emissions standards and intentionally misrepresented their lack of compliance with federal and state law.

85.     Thus, Defendants are estopped from relying on any statutes of limitations in defense of this action.

## COUNT I

## VIOLATIONS OF THE RACKETEER INFLUENCED & CORRUPT ORGANIZATIONS ACT

## (18 U.S.C. §1962(c)-(d))

### (On Behalf of the Nationwide Class Against All Defendants)

86.     Plaintiff incorporates all allegations made herein.

87.     This claim arises under 18 U.S.C. §1962(c) and (d), which provides in relevant part:

> (c)     It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

> (d)     It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section.

88.     Defendants engaged in a fraudulent scheme, common course of conduct and conspiracy to increase market share and revenues and to minimize losses for Defendants and their co-conspirators from the design, manufacture, distribution and sale of the Defective Vehicles.

89.     To achieve these goals, Defendants entered into agreements to sell the Defective Vehicles to the public, obtained fraudulent certificates of conformity from the EPA, and disseminated false and misleading advertising and marketing materials

to sell such vehicles without disclosing that they were illegal and defective.  As a direct result of their conspiracy and fraudulent scheme, Defendants were able to extract revenues of billions of dollars from Plaintiff and the Class.

90.     Chrysler is the seventh-largest automaker in the world by sales, and conducts its business – legitimate and illegitimate – through various affiliates and subsidiaries, each of which is a separate legal entity.  Cummins, the market leader in diesel truck engines, also conducts its business through various affiliates and subsidiaries, each of which is a separate legal entity.  At all relevant times, Defendants were "person[s]," as defined in 18 U.S.C. §1961(3), because they were "capable of holding a legal or beneficial interest in property."

91.     In an effort to expand its global reach, market share, and standardization of vehicle marketing and sales in the diesel truck market, Defendants engaged in an aggressive campaign to develop and sell diesel trucks purported to be "clean" and environmentally friendly, while surreptitiously taking engineering shortcuts and using engine technology that was intended to circumvent emissions tests and cause the Defective Vehicles to fraudulently pass these tests. As a direct and proximate result of their fraudulent scheme and common course of conduct, Defendants were able to extract revenues of billions of dollars from Plaintiff and the Class.

92.     Chrysler and Cummins, and potentially other individuals and entities and others involved in the design, manufacture, testing, and sale of the Defective Vehicles,

operated an association-in-fact enterprise, which was formed for the purpose of obtaining fraudulent certificates of conformity from the EPA and manufacturing, selling, importing and distributing the Defective Vehicles, and through which they conducted a pattern of racketeering activity, under 18 U.S.C. §1961(4). The enterprises alleged in this and the previous paragraph are referred to collectively as the "Illegal Defeat Device Enterprise."

93. Alternatively, each of the Defendants constitutes a single legal entity "enterprise" within the meaning of 18 U.S.C. §1961(4), through which Defendants conducted their pattern of racketeering activity in the U.S. In particular, Chrysler designed, manufactured, and sold the Defective Vehicles, and Chrysler obtained the EPA certificates of conformity and the California Air Resources Board ("CARB") executive orders through material misrepresentations and omissions in order to introduce the Defective Vehicles into the U.S. stream of commerce. Cummins participated directly or indirectly in the enterprise by developing, supplying, and promoting the 6.7-liter Cummins Turbo Diesel Engine and assisting Chrysler in obtaining EPA certificates of conformity and CARB executive orders for the Defective Vehicles.

94. The Illegal Defeat Device Enterprise constituted a single "enterprise" or multiple enterprises within the meaning of 18 U.S.C. §1961(4), as individuals and

other entities associated-in-fact for the common purpose of engaging in Defendants' profit-making scheme.

95.    Defendants are employed by, and/or associated with, the Illegal Defeat Device Enterprise.

96.    Defendants directed the affairs of the Illegal Defeat Device Enterprise through, among other things, using their executive officers and engineers to direct critical aspects of the enterprise's operations, including the decision to emphasize the clean (and purportedly legal) emissions of the Defective Vehicles, the decision to design and manufacture Defective Vehicles that emit illegally excessive emissions, and the various methods by which Defendants deceived regulators into approving the Defective Vehicles and issues certificates of conformity and executive orders.

97.    The Illegal Defeat Device Enterprise is an ongoing and continuing organization consisting of legal entities, including Chrysler, its subsidiaries and network of dealerships, Cummins and its subsidiaries, as well as any third-party entities and individuals associated for the common or shared purpose of design, manufacture, distribution, testing, and sale of the Defective Vehicles to Plaintiff and the Class through fraudulent certificates of compliance, deceptive and misleading sales tactics or materials, and deriving profits and revenues from those activities.

98.    The Illegal Defeat Device Enterprise functions by selling vehicles to the consuming public. Many of these products are legitimate, including vehicles that do

not contain defeat devices.  However, Defendants, through the Illegal Defeat Device Enterprise, have engaged in a pattern of racketeering activity which also involves a fraudulent scheme to increase revenue for Defendants and the other entities and individuals associated-in-fact with the Enterprise's activities through the illegal scheme.

99.     The Illegal Defeat Device Enterprise engages in and affects interstate commerce because it involves commercial activities across state boundaries, such as the marketing, promotion, advertisement and sale of the Defective Vehicles throughout the country, and the receipt of monies from the sale of the same.

100.     Within the Illegal Defeat Device Enterprise there was a common communication network by which co-conspirators shared information on a regular basis.  The Illegal Defeat Device Enterprise used this common communication network for the purpose of manufacturing, marketing, testing, and selling the Defective Vehicles to the general public nationwide.

101.     Defendants participated in the operation and management of the Illegal Defeat Device Enterprise by directing its affairs, as described herein.  While Defendants participated in, and are members of, the Enterprise, they have a separate existence from the enterprise, including distinct legal statuses, different offices and roles, bank accounts, officers, directors, employees, individual personhood, reporting requirements, and financial statements.

102.   Each participant in the Illegal Defeat Device Enterprise had a systematic linkage to each other through contractual relationships, financial ties, and continuing coordination of activities.  Through the Illegal Defeat Device Enterprise, Defendants functioned as a continuing unit with the purpose of assisting with and furthering the illegal scheme and their common purpose.

103.   Defendants and the other members of the Illegal Defeat Device Enterprise all had the common purpose to maximize revenues and increase their market share and minimize losses by advertising and selling the Defective Vehicles as legal and "clean" diesel vehicles with superior fuel efficiency and performance, which they knew or recklessly disregarded as defective and designed illegally to circumvent laws in this country.

104.   The Illegal Defeat Device Enterprise engaged in, and its activities affected, interstate and foreign commerce by designing, manufacturing, marketing, testing, and selling the Defective Vehicles to hundreds of thousands of persons in the United States.

105.   Defendants exerted substantial control over the Illegal Defeat Device Enterprise and participated in the conduct of the enterprise's affairs by:

(a)   designing the Defective Vehicles with cheat software and/or auxiliary devices;

(b)     manufacturing Defective Vehicles that emitted greater pollution than the legal limit;

(c)     introducing the Defective Vehicles into the stream of United States commerce without a valid EPA COC because the applications for such certificates were fraudulent;

(d)     designing and distributing marketing materials that misrepresented and concealed the defect in the vehicles;

(e)     otherwise misrepresenting or concealing the defective nature of the Defective Vehicles from the public and regulators;

(f)     illegally selling the Defective Vehicles; and

(g)     collecting revenues and profits from the sale of such products.

106.   Defendants knew of the ongoing scheme, were willing participants in it, and made money from it.

107.   Defendants directed and controlled the ongoing organization necessary to implement the scheme at meetings and through communications of which Plaintiff cannot fully know at present, because all such information lies in Defendants' and others' hands.

108.   Defendants, each of whom is a person associated-in-fact with the Illegal Defeat Device Enterprise, did knowingly conduct or participate, directly or indirectly, in the conduct of the enterprise's affairs through a pattern of racketeering activity

within the meaning of 18 U.S.C. §§1961(1), 1961(5) and 1962(c). Defendants have committed, or aided and abetted in the commission of at least two predicate acts of racketeering activity (*i.e.*, violations of 18 U.S.C. §§1341 and 1343), within the past ten years. The multiple acts of racketeering activity which they committed, or aided or abetted in the commission of, were related to each other, posed a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity." The racketeering activity was made possible by Defendants' regular use of the facilities, services, distribution channels, and employees of the Illegal Defeat Device Enterprise.

109. In devising and executing the illegal scheme, Defendants devised and knowingly carried out a material scheme or artifice to defraud Plaintiff and the Class or to obtain money from Plaintiff and the Class by means of materially false or fraudulent pretenses, representations, promises, or omissions of material facts. For the purpose of executing the illegal scheme, Defendants committed these racketeering acts, which number in the thousands, intentionally and knowingly with the specific intent to advance the illegal scheme.

110. Defendants' predicate acts of racketeering (18 U.S.C. §1961(1)) include, but are not limited to:

(a) **Mail Fraud**: Defendants violated 18 U.S.C. §1341 by sending or receiving, or by causing to be sent and or received, materials via U.S. mail or

commercial interstate carriers for the purpose of executing the unlawful scheme to design, manufacture, market, and sell the Defective Vehicles by means of false pretenses, misrepresentations, promises, and omissions.

(b)   **Wire Fraud**:   Defendants violated 18 U.S.C. §1343, by transmitting and or receiving, or causing to be transmitted and or received, materials by wire for the purpose of executing the unlawful scheme to defraud and obtain money on false pretenses, misrepresentations, promises, and omissions.

111.   Defendants used (or caused to be used), thousands of interstate mail and wire communications in the execution of the scheme through virtually uniform misrepresentations, concealments and material omissions.  Defendants' use of the mails and wires include, but are not limited to, the transmission, delivery, or shipment of the following by Defendants or third parties that were foreseeably caused to be sent as a result of Defendants' illegal scheme:

(a)   the Defective Vehicles themselves;

(b)   components for the defeat device;

(c)   essential hardware for the Defective Vehicles;

(d)   falsified emissions tests;

(e)   fraudulent applications for EPA certificates of conformity and CARB executive orders, of which Approved Applications were received in the mail on April 9, 2008, June 23, 2008, June 6, 2008, and July 2, 2008;

(f)     vehicle registrations and plates due to cheat device and fraudulently-obtained EPA certificates of conformity;

(g)     documents and communications that facilitated the falsified emissions tests;

(h)     false or misleading communications intended to lull the public and regulators from discovering the cheat software and/or auxiliary devices;

(i)     sales and marketing materials, including advertising, websites, product packaging, brochures, and labeling, which misrepresented and concealed the true nature of the Defective Vehicles;

(j)     documents intended to facilitate the manufacture and sale of the Defective Vehicles, including bills of lading, shipping records, reports and correspondence;

(k)     documents to process and receive payment for the Defective Vehicles by unsuspecting consumers, including invoices and receipts;

(l)     deposits of proceeds; and

(m)     other documents and things, including electronic communications.

112.   Defendants also used the internet and other electronic facilities to carry out the scheme and conceal the ongoing fraudulent activities.  Specifically, Chrysler and Cummins made representations about the Defective Vehicles on their websites, YouTube and other video platforms, and through ads and reviews online, all of which

were intended to mislead regulators and the public about the fuel-efficiency, emissions standards, and other performance metrics.

113.   Defendants also communicated by U.S. mail, by interstate facsimile, and by interstate electronic mail with various other affiliates, regional offices, divisions, dealerships and other third-party entities in furtherance of the scheme.

114.   Many of the precise dates of the fraudulent uses of the U.S. Mail and interstate wire facilities are hidden to Plaintiff, and cannot be alleged without access to Defendants' books and records. However, Plaintiff has described the types of predicate acts of mail and/or wire fraud that occurred.

115.   The mail and wire transmissions described herein were made in furtherance of Defendants' scheme to deceive regulators and consumers and lure consumers into purchasing Defective Vehicles, which Defendants knew or recklessly disregarded as emitting greater pollution than advertised.  These acts of mail and wire fraud were not committed in isolation; they were related and posed a threat of continued fraudulent activity.

116.   Defendants and other members of the Illegal Defeat Device Enterprise have obtained money and property belonging to Plaintiff and the Class as a result of these violations.  Plaintiff and other Class members have been injured in their business or property by Defendants' overt acts of mail and/or wire fraud, and by their aiding and abetting others' acts of mail and wire fraud.  In fact, they never would have

purchased the Defective Vehicles but for Defendants' illegal scheme and common course of conduct.

117.   Defendants have not undertaken the practices described herein in isolation, but as part of a common scheme and conspiracy.  In violation of 18 U.S.C. §1962(d), Defendants conspired to violate 18 U.S.C. §1962(c), as described herein. Various other persons, firms and corporations, including third-party entities and individuals not named as defendants in this Complaint, have participated as co-conspirators with Defendants in these offenses and have performed acts in furtherance of the conspiracy to increase or maintain revenues, increase market share, and/or minimize losses for Defendants and their unnamed co-conspirators throughout the illegal scheme.

118.   Defendants aided and abetted others in the violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§1341 and 1343 offenses.

119.   Defendants engaged in a conspiracy to: (a) increase or maintain revenues; (b) increase market share; and (c) minimize losses of revenues or profits for Defendants and their co-conspirators.

120.   To achieve these goals, Defendants hid from the general public the unlawfulness and emissions dangers of the Defective Vehicles and obfuscated the true nature of the defect even after regulators raised concerns.  Defendants suppressed

and/or ignored warnings from third-parties, whistleblowers, and governmental entities of both the unlawfulness of the defeat device and of the defects present in the Defective Vehicles.

121.   Defendants, with knowledge and intent, have agreed to the overall objectives of the conspiracy and participated in the common course of conduct to commit acts of fraud and indecency in designing, manufacturing, distributing, marketing, testing, and selling the Defective Vehicles.

122.   Indeed, for the conspiracy to succeed, Defendants and their co-conspirators had to agree to implement and use the similar devices and fraudulent tactics against their intended targets.

123.   Plaintiff and the Class have been injured in their property by the violations of 18 U.S.C. §§1962(c) and 1962(d), including the purchase price of the Defective Vehicles, the loss of value of their vehicles, greater fuel costs, and other related expenses.   In the absence of the unlawful scheme, Plaintiff and the Class would not have incurred these economic losses.   Indeed, no one would have purchased or leased a Defective Vehicle because Defendants could not obtain a valid EPA COC without use of a defeat device.

124.   Plaintiff's and the Class's injuries were directly and proximately caused by Defendants' racketeering activities.

125.   Defendants knew and intended that Plaintiff and the Class would rely on their misrepresentations and omissions about the Defective Vehicles.  Defendants knew and intended that consumers would incur costs as a result.  As fully alleged herein, Plaintiff, along with thousands of other consumers, relied upon Defendants' representations and omissions.  Their reliance is made obvious by the fact that they purchased an illegal vehicle that never should have been introduced into the stream of commerce in the United States and whose worth has now plummeted and has no "fix" in sight.  In addition, the EPA and regulators also relied on Defendants' statements; otherwise Defendants could not have obtained a valid COC to sell vehicles.

126.   Because of Defendants' illegal scheme, common course of conduct, and conspiracy, Plaintiff and the Class purchased vehicles that are now depreciated in value.  The damages suffered by Plaintiff and the Class may be measured by the total amount paid for the vehicles, which totals billions of dollars nationwide, even without trebling their damages.

127.   Under 18 U.S.C. §1964(c), Plaintiff is entitled to recover treble his actual damages plus interest, the costs of bringing this suit, and reasonable attorneys' fees.

## COUNT II

## VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT

### (15 U.S.C. §2301, *et seq*.)

### (On Behalf of the Nationwide Class Against Chrysler)

128.   Plaintiff incorporates all allegations made in ¶¶1-85.

129.   The Defective Vehicles are "consumer product[s]" as defined in 15 U.S.C. §2301(1).

130.   Plaintiff and the Class are "consumer[s]" as defined in 15 U.S.C. §2301(3).

131.   Chrysler is a "supplier" and "warrantor" as defined in 15 U.S.C. §2301(4)-(5).

132.   Chrysler provided Plaintiff and the Class with numerous written warranties as described in 15 U.S.C. §2301(6).

133.   Chrysler made implied warranties arising under state law regarding the Defective Vehicles within the meaning of 15 U.S.C. §2301(7).

134.   Chrysler's warranties pertained to consumer products costing more than $25.

135.   Chrysler provided Plaintiff and the Class who purchased a new Defective Vehicle with a written Manufacturer's Warranty, which provides "bumper-to-bumper" limited express warranty coverage for the lesser of three years or 36,000 miles.  This warranty includes coverage of emission-related repairs.

136.   Additionally, Chrysler provided a Federal Emissions Warranty to members of the Class, which covers all emissions-related parts for the lesser of two years or 24,000 miles, as well as an emissions warranty for the catalytic converter,

engine control unit, and onboard diagnostic device for the lesser of eight years or 80,000 miles.

137.  Chrysler breached these warranties by selling Defective Vehicles containing defeat devices for the specific purpose of circumventing EPA emissions regulation, while surreptitiously emitting hazardous $NO_X$ well above the legal limit.

138.  In order to restrict emissions to the legal limit and deactivate the defeat device, the Defective Vehicles will need to be repaired, thus lowering the performance and/or efficiency of the Defective Vehicles.  Thus, Chrysler's breach of these warranties has deprived Plaintiff and other Class members of the benefit of their bargain.

139.  The amount in controversy of the Plaintiff's individual claims meets or exceeds the sum or value of $25.  In addition, the amount in controversy for the Class meets or exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.

140.  Chrysler could have disclosed information regarding the inability of the Defective Vehicles to perform as warranted or attempted to cure its breach of warranties, but Chrysler chose not to do so and instead chose to conceal these critical facts from Plaintiff and the Class.

141.  As a direct and proximate result of Chrysler's conduct, Plaintiff has lost money or property by purchasing the Defective Vehicle he otherwise would not have,

or paying a premium he otherwise would not have, and the Defective Vehicle has suffered a diminution in value.  Plaintiff and the Class are entitled to legal and equitable relief against Chrysler, including damages, specific performance, attorneys' fees, costs of suit, and other relief as appropriate.

142.   Resorting to any informal dispute settlement procedure and/or affording Chrysler an opportunity to cure these breaches of warranties is unnecessary and/or futile.  Any remedies available through any informal dispute settlement procedure would be inadequate under the circumstances, as Chrysler cannot remedy the problems associated with the Defective Vehicles without significantly reducing the effectiveness of the Defective Vehicles, and, as such, permanently causing financial harm to the Plaintiff.  Any requirement – whether under the MMWA or otherwise – that Plaintiff resort to an informal dispute resolution procedure and/or afford Chrysler a reasonable opportunity to cure its breach of warranties is redundant and excused and thereby deemed satisfied.

## COUNT III

## BREACH OF EXPRESS WARRANTY

### (On Behalf of the Nationwide Class, or Alternatively, the Michigan Class Against Chrysler)

143.   Plaintiff incorporates all allegations made in ¶¶1-85.

144.   Chrysler's actions, as alleged above, violate the state express warranty statute in the state of Michigan (MICH. COMP. LAWS §440.2323).

145.   Chrysler marketed, sold and distributed the Defective Vehicles to Plaintiff and the members of the Class in the regular course of its business.

146.   Chrysler expressly represented and warranted, by and through statements, descriptions, and affirmations of fact made by it and its authorized agents and representatives that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all while maintaining excellent gas mileage and high quality performance.  These representations were materially false.

147.   Further, Chrysler issued a written warranty to Plaintiff and the members of the Class in which Chrysler warranted that the Defective Vehicles were free from defects in material and workmanship.

148.   Finally, Chrysler expressly represented and warranted that the Defective Vehicles were legal for sale and purchase, and had legally obtained EPA COCs and other state emissions certifications.

149.   In reliance upon these express warranties, Plaintiff and the members of the Class purchased or leased the Defective Vehicles.

150.   The Defective Vehicles failed to comply with the express warranties because they suffered from inherent defects that, from the date of purchase forward, rendered the Defective Vehicles unfit for their intended use and purpose and left them with significant defects in material and workmanship.

151.   Chrysler knew or had reason to know that the Defective Vehicles did not conform to the express representations because the vehicles were neither efficient, environmentally friendly, usable, nor free from defects as represented.

152.   Plaintiff notified Chrysler of the breach within a reasonable time and/or were not required to do so because affording Chrysler a reasonable opportunity to cure its breach of written warranty would have been futile.

153.   As a direct and proximate cause from Chrysler's breach, Plaintiff and the other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease.  Additionally, Plaintiff and the Class either have incurred or will incur economic damages at the point of repair in the form of the cost of repair, cost of increased fuel consumption, and cost of increased maintenance.

154.   Plaintiff and the Class members are entitled to legal and equitable relief against Chrysler, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT IV

## BREACH OF IMPLIED WARRANTY

**(On Behalf of the Nationwide Class, or Alternatively, the Michigan Class Against Chrysler)**

155.   Plaintiff incorporates all allegations made in ¶¶1-85.

- 53 -

156.   Chrysler's actions, as alleged above, violate the implied warranty of merchantability statute in the state of Michigan (MICH. COMP. LAWS §440.2314(1)).

157.   Chrysler marketed, sold and distributed the Defective Vehicles to Plaintiff and the members of the Class in the regular course of its business.

158.   Chrysler impliedly warranted, by and through statements, descriptions, and affirmations of fact made by it and its authorized agents and representatives that the Defective Vehicles were of merchantable quality, would pass without objection in the trade or business under the contract description, and were free of material defects and fit for the ordinary purposes for which they were to be used.

159.   In reliance upon these implied warranties, Plaintiff and the members of the Class purchased or leased the Defective Vehicles.

160.   The Defective Vehicles failed to comply with the implied warranties because they suffered from inherent design defects that, from the date of purchase forward, rendered the Defective Vehicles unfit for their intended use and purpose and made them not free from defects in material and workmanship.  Specifically, the Defective Vehicles were equipped with defective diesel engine systems that emitted unlawful levels of $NO_X$.

161.    Chrysler knew that the vehicles did not conform to the implied warranties because the Defective Vehicles were neither usable nor free from defects as represented.

162.    Plaintiff notified Chrysler of the breach within a reasonable time and/or were not required to do so because affording Chrysler a reasonable opportunity to cure its breach of written warranty would have been futile.

163.    Plaintiff and Class members have had sufficient direct dealings with either Chrysler or its agents (via dealerships) to establish privity of contract between Plaintiff and the Class members.  Notwithstanding this, privity is not required in this case because Plaintiff and Class members are intended third-party beneficiaries of contracts between Chrysler and its dealers; specifically, they are the intended beneficiaries of Chrysler's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and the Class members' Defective Vehicles are considered dangerous instrumentalities.

164.    As a direct and proximate cause of Chrysler's breach, Plaintiff and the other Class members have suffered damages, including economic damages at the point of sale or lease.  Additionally, Plaintiff and the other Class members either have

incurred or will incur economic damages at the point of repair in the form of the cost of repair, increased future fuel costs, and increased future maintenance costs.

165.   Plaintiff and the other Class members are entitled to legal and equitable relief against Chrysler, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT V

## FRAUD BY CONCEALMENT

### (On Behalf of the Michigan Class Against All Defendants)

166.   Plaintiff incorporates all allegations made in ¶¶1-85.

167.   Defendants intentionally concealed and suppressed material facts concerning the quality and character of the Defective Vehicles.  As alleged herein, Defendants engaged in deception to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions.

168.   The software installed on the vehicles at issue was designed to only activate during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road.  The result was that the Defective Vehicles  improperly passed emissions certifications by way of deliberately induced false readings.  Accordingly, the Defective Vehicles should never have been offered for sale by Defendants.

169.   Plaintiff and Class members reasonably relied upon Defendants' false representations.  They had no way of knowing that Defendants' representations were

false and misleading.   As alleged herein, Defendants employed extremely sophisticated methods of deception.  Plaintiff and Class members did not, and could not, discover Defendants' deception on their own.

170.   Defendants' false representations were material to consumers because they concerned the quality of the Defective Vehicles, including their compliance with applicable federal and state laws and regulations regarding clean air and emissions, and also because of the price premium charged for the Defective Vehicles.

171.   Defendants had a duty to disclose the emissions deception in which they engaged with respect to the Defective Vehicles because knowledge of the deception and its details were known and/or accessible only to Defendants.   Likewise, Defendants knew the facts were unknown to or not reasonably discoverable by Plaintiff or Class members.

172.   In addition, Defendants had a duty to disclose because they made affirmative misrepresentations and/or material omissions about the qualities of the vehicles with respect to emissions standards.  These include, but are not limited to, references that the vehicles are clean diesel vehicles, which were misleading, deceptive, and incomplete without the disclosure of the deception.

173.   Having volunteered to provide information to Plaintiff and the Class, Defendants had the duty to disclose the entire truth.  These omitted and concealed

facts were material because they directly affect the legality, value, and performance of the Defective Vehicles purchased or leased by Plaintiff and the Class members.

174.   Defendants actively concealed and/or suppressed these material facts to increase their profits and market share and to avoid the perception that the Defective Vehicles did not or could not comply with federal and state laws governing clean air and emissions.  Such a perception would have been detrimental to Defendants' brands.

175.   Plaintiff and the Class members were unaware of the omitted material facts referenced herein, and they would not have purchased or leased the Defective Vehicles if they had known of the concealed and/or suppressed material facts.

176.   Based on the concealment of the facts, Plaintiff and the Class members have sustained damages because they were induced to purchase the illegal Defective Vehicles they now own or lease vehicles that are diminished in value as a result of Defendants' concealment of the true quality and quantity of those vehicles' emissions, and Defendants' failure to timely disclose the true facts about hundreds of thousands of Dodge Ram vehicles.

177.   Accordingly, Defendants are liable to Plaintiff and Class members for damages in an amount to be determined at trial.  Defendants' acts were done wantonly, maliciously, and deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class members' needs, and warrant an assessment of punitive damages, also in an amount to be determined.

## COUNT VI

## BREACH OF CONTRACT

### (On Behalf of the Michigan Class Against Chrysler)

178.   Plaintiff incorporates all allegations made in ¶¶1-85.

179.   The conduct alleged herein, where Chrysler surreptitiously installed defeat devices in the Defective Vehicles in order to fraudulently pass EPA emissions tests, constitutes a significant and material breach of contract.  The Defective Vehicles would not achieve the performance benchmarks represented by Chrysler without using the defeat device to fraudulently pass the EPA emissions tests.

180.   Had Chrysler not deceived Plaintiff and the EPA, Plaintiff would not have purchased or leased the Defective Vehicles, or would not have purchased the Defective Vehicles at the premium prices that Chrysler charged.

181.   Chrysler's sale of these Defective Vehicles constitutes a contract between Chrysler and the purchaser or lessee, and these contracts were breached by Chrysler's brazen deception and decision to circumvent EPA regulations, thus inducing purchase or lease, and leaving Plaintiff with Defective Vehicles that were of greatly diminished value and/or performance, and/or increased costs.

182.   As a direct and proximate result of Chrysler's breach of contract, Plaintiff and the other Class members are entitled to legal and equitable relief against Chrysler, including but not limited to, damages, incidental and consequential damages, attorneys' fees, costs of suit, and other relief as appropriate.

# COUNT VII

## VIOLATION OF MICHIGAN CONSUMER PROTECTION ACT

### (Mich. Comp. Laws §445.901 *et seq*.)

### (On Behalf of the Michigan Class Against All Defendants)

183.   Plaintiff incorporates all allegations made in ¶¶1-85.

184.   Plaintiff brings this claim on behalf of the Nationwide Class, or alternatively, the Michigan Class.

185.   The Michigan Consumer Protection Act (Mich. Comp. Laws §445.901, *et seq.*) ("MCPA"), holds unlawful "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce."

186.   At all times relevant hereto, Defendants were conducting trade or commerce as defined under the MCPA §445.902(1)(g).

187.   At all relevant times hereto, Defendants were "persons" engaged in "trade or commerce" within the meaning of the MCPA §445.902(1)(d).

188.   Plaintiff and the Class members are persons under the MCPA. *Id*. §445.902.

189.   A party to a transaction covered under the MCPA must provide the other party the promised benefits of the transaction.

190.   Defendants' acts and practices as discussed throughout this Complaint were unfair or deceptive acts that are unlawful in violation of the MCPA for, *inter alia*, one or more of the following reasons:

(a)   Defendants designed and secretly installed the defeat device with the intention of deceiving regulators and the public;

(b)   Defendants represented that the Defective Vehicles had approval, characteristics, uses, and benefits that they do not have;

(c)   Defendants provided and otherwise distributed false and misleading information to consumers regarding the legality of the Defective Vehicles, their true emissions characteristics, and performance;

(d)   Defendants represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were of another;

(e)   Defendants engaged in unconscionable commercial practices in failing to reveal, and intentionally concealing, material facts and information about the Defective Vehicles, which misled Plaintiff and the Class;

(f)   Defendants failed to reveal, and intentionally concealed, facts about the Defective Vehicles that were material to the transaction and which they intended that Plaintiff and members of the Class would rely on.

191.   Defendants committed these and other unfair and deceptive acts with regard to the marketing and sale and/or lease of the Defective Vehicles.

192.   Defendants knew that the Defective Vehicles contained the defeat device designed to deceive regulators and the public.

193.   Defendants' concealment and/or failure to warn that the Defective Vehicles contained the defeat device constitutes an unfair, unconscionable, or deceptive act within the meaning of the MCPA.

194.   The unfair, unconscionable, and deceptive acts committed by Defendants caused damages to Plaintiff and Class members.  Plaintiff and the Class members have lost money or property by purchasing or leasing the Defective Vehicles which they otherwise would not have done, or paid a premium, which they otherwise would not have paid, and the Defective Vehicles have suffered a diminution in value, and any fix would result in increased fuel and efficiency costs, and decreased performance.

195.   Plaintiff and members of the Class are entitled to compensatory damages, injunctive/equitable relief, and attorneys' fees under the MCPA.

## COUNT VIII

## BREACH OF EXPRESS WARRANTY

## (N.C.G.S.A. §§25-2-313 and 252A-210)

### (On Behalf of the North Carolina Class Against Chrysler)

196.   Plaintiff incorporates all allegations made in ¶¶1-85.

197.   Chrysler's actions, as alleged above, violate the state express warranty statute in the state of North Carolina.

198.   Chrysler is, and was at all relevant times a "merchant" with respect to motor vehicles under N.C.G.S.A. §25-2-104(1) and "seller" of motor vehicles under §25-2-103(1)(d).

199.   With respect to leases, Chrysler is, and was at all relevant times a "lessor" of motor vehicles under N.C.G.S.A. §25-2A-103(1)(p).

200.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. §25-2-105(1) and N.C.G.S.A. §25-2A-103(1)(h).

201.   Chrysler marketed, sold and distributed the Defective Vehicles to Plaintiff and the members of the Class in the regular course of its business.

202.   Chrysler expressly represented and warranted, by and through statements, descriptions, and affirmations of fact made by it and its authorized agents and representatives that the Defective Vehicles were environmentally friendly and produced legal levels of emissions, all while maintaining excellent gas mileage and high quality performance.  These representations were materially false.

203.   Further, Chrysler issued a written warranty to Plaintiff and the members of the Class in which Chrysler warranted that the Defective Vehicles were free from defects in material and workmanship.

204.   Finally, Chrysler expressly represented and warranted that the Defective Vehicles were legal for sale and purchase, and had legally obtained EPA COCs and other state emissions certifications.

205.   In reliance upon these express warranties, Plaintiff and the members of the Class purchased or leased the Defective Vehicles.

206.   The Defective Vehicles failed to comply with the express warranties because they suffered from inherent defects that, from the date of purchase forward, rendered the Defective Vehicles unfit for their intended use and purpose and left them with significant defects in material and workmanship.

207.   Chrysler knew or had reason to know that the Defective Vehicles did not conform to the express representations because the vehicles were neither efficient, environmentally friendly, usable, nor free from defects as represented.

208.   Plaintiff notified Chrysler of the breach within a reasonable time and/or were not required to do so because affording Chrysler a reasonable opportunity to cure its breach of written warranty would have been futile.

209.   As a direct and proximate cause of Chrysler's breach, Plaintiff and the other Class members have suffered damages and continue to suffer damages, including economic damages at the point of sale or lease.  Additionally, Plaintiff and the Class either have incurred or will incur economic damages at the point of repair in the form of the cost of repair, cost of increased fuel consumption, and cost of increased maintenance.

210.   Plaintiff and the Class members are entitled to legal and equitable relief against Chrysler, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT IX

## BREACH OF IMPLIED WARRANTY

## (N.C.G.S.A. §§25-2-314 AND 252A-212)

### (On Behalf of the North Carolina Class Against Chrysler)

211.   Plaintiff incorporates all allegations made in ¶¶1-85.

212.   Chrysler's actions, as alleged above, violate the implied warranty of merchantability statute in the state of North Carolina.

213.   Chrysler marketed, sold and distributed the Defective Vehicles to Plaintiff and the members of the Class in the regular course of its business.

214.   Chrysler is, and was at all relevant times a "merchant" with respect to motor vehicles under N.C.G.S.A. §25-2-104(1) and "seller" of motor vehicles under §25-2-103(1)(d).

215.   With respect to leases, Chrysler is, and was at all relevant times a "lessor" of motor vehicles under N.C.G.S.A. §25-2A-103(1)(p).

216.   The Defective Vehicles are and were at all relevant times "goods" within the meaning of N.C.G.S.A. §25-2-105(1) and N.C.G.S.A. §25-2A-103(1)(h).5.  A warranty that the Defective Vehicles were in merchantable condition and fit for the

- 65 -

ordinary purpose for which vehicles are used is implied by law pursuant to N.C.G.S.A. §25-2-314 and N.C.G.S.A. §25-2A-212.

217.   Chrysler impliedly warranted, by and through statements, descriptions, and affirmations of fact made by it and its authorized agents and representatives that the Defective Vehicles were of merchantable quality, would pass without objection in the trade or business under the contract description, and were free of material defects and fit for the ordinary purposes for which they were to be used.

218.   In reliance upon these implied warranties, Plaintiff and the members of the Class purchased or leased the Defective Vehicles.

219.   The Defective Vehicles failed to comply with the implied warranties because they suffered from inherent design defects that, from the date of purchase forward, rendered the Defective Vehicles unfit for their intended use and purpose and made them not free from defects in material and workmanship.  Specifically, the Defective Vehicles were equipped with defective diesel engine systems.

220.   Chrysler knew that the vehicles did not conform to the implied warranties because the vehicles were neither usable nor free from defects as represented.

221.   Plaintiff notified Chrysler of the breach within a reasonable time and/or was not required to do so because affording Chrysler a reasonable opportunity to cure its breach of written warranty would have been futile.

222.   Plaintiff and Class members have had sufficient direct dealings with either Chrysler or its agents (via dealerships) to establish privity of contract between Plaintiff and the Class members.  Notwithstanding this, privity is not required in this case because Plaintiff and Class members are intended third-party beneficiaries of contracts between Chrysler and its dealers; specifically, they are the intended beneficiaries of Chrysler's implied warranties.  The dealers were not intended to be the ultimate consumers of the Defective Vehicles and have no rights under the warranty agreements provided with the Defective Vehicles; the warranty agreements were designed for and intended to benefit the ultimate consumers only.  Finally, privity is also not required because Plaintiff's and the Class members' Defective Vehicles are considered dangerous instrumentalities.

223.   As a direct and proximate cause of Chrysler's breach, Plaintiff and the other Class members have suffered damages, including economic damages at the point of sale or lease.  Additionally, Plaintiff and the other Class members either have incurred or will incur economic damages at the point of repair in the form of the cost of repair, increased future fuel costs, and increased future maintenance costs.

224.   Plaintiff and the other Class members are entitled to legal and equitable relief against Chrysler, including damages, consequential damages, specific performance, rescission, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT X

## FRAUD BY CONCEALMENT

### (On Behalf of the North Carolina Class Against All Defendants)

225.   Plaintiff incorporates all allegations made in ¶¶1-85.

226.   Defendants intentionally concealed and suppressed material facts concerning the quality and character of the Defective Vehicles.  As alleged herein, Defendants engaged in deception to evade federal and state vehicle emissions standards by installing software designed to conceal its vehicles' emissions.

227.   The software installed on the vehicles at issue was designed to only activate during emissions certification testing, such that the vehicles would show far lower emissions than when actually operating on the road.  The result was that the Defective Vehicles improperly passed emissions certifications by way of deliberately induced false readings.  Accordingly, the Defective Vehicles should never have been offered for sale by Defendants.

228.   Plaintiff and Class members reasonably relied upon Defendants' false representations.  They had no way of knowing that Defendants' representations were false and misleading.  As alleged herein, Defendants employed extremely sophisticated methods of deception.  Plaintiff and Class members did not, and could not, discover Defendants' deception on their own.

229.   Defendants' false representations were material to consumers because they concerned the quality of the Defective Vehicles, including their compliance with

applicable federal and state laws and regulations regarding clean air and emissions, and also because of the price premium charged for the Defective Vehicles.

230.   Defendants had a duty to disclose the emissions deception in which they engaged with respect to the Defective Vehicles because knowledge of the deception and its details were known and/or accessible only to Defendants.   Likewise, Defendants knew the facts were unknown to or not reasonably discoverable by Plaintiff or Class members.

231.   In addition, Defendants had a duty to disclose because they made affirmative misrepresentations and/or material omissions about the qualities of thes vehicles with respect to emissions standards.  These include, but are not limited to, references that the vehicles are clean diesel vehicles, which were misleading, deceptive, and incomplete without the disclosure of the deception.

232.   Having volunteered to provide information to Plaintiff and the Class, Defendants had the duty to disclose the entire truth.  These omitted and concealed facts were material because they directly affect the legality, value, and performance of the Defective Vehicles purchased or leased by Plaintiff and the Class members.

233.   Defendants actively concealed and/or suppressed these material facts to increase their profits and market share and to avoid the perception that the Defective Vehicles did not or could not comply with federal and state laws governing clean air and emissions.  Such a perception would have been detrimental to Defendants' brands.

234.   Plaintiff and the Class members were unaware of the omitted material facts referenced herein, and they would not have purchased or leased the Defective Vehicles if they had known of the concealed and/or suppressed material facts.

235.   Based on the concealment of the facts, Plaintiff and the Class members have sustained damages because they were induced to purchase the illegal Defective Vehicles they now own or lease vehicles that are diminished in value as a result of Defendants' concealment of the true quality and quantity of those vehicles' emissions, and Defendants' failure to timely disclose the true facts about hundreds of thousands of Dodge Ram vehicles.

236.   Accordingly, Defendants are liable to Plaintiff and Class members for damages in an amount to be determined at trial.   Defendants' acts were done wantonly, maliciously, and deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and the Class members' needs, and warrant an assessment of punitive damages, also in an amount to be determined.

## COUNT VI

## BREACH OF CONTRACT

### (On Behalf of the North Carolina Class Against Chrysler)

237.   Plaintiff incorporates all allegations made in ¶¶1-85.

238.   The conduct alleged herein, where Chrysler surreptitiously installed defeat devices in the Defective Vehicles in order to fraudulently pass EPA emissions tests, constitutes a significant and material breach of contract.   The Defective Vehicles

would not achieve the performance benchmarks represented by Chrysler without using the defeat device to fraudulently pass the EPA emissions tests.

239.   Had Chrysler not deceived Plaintiff and the EPA, Plaintiff would not have purchased or leased the Defective Vehicles, or would not have purchased the Defective Vehicles at the premium prices that Chrysler charged.

240.   Chrysler's sale of these Defective Vehicles constitutes a contract between Chrysler and the purchaser or lessee, and these contracts were breached by Chrysler's brazen deception and decision to circumvent EPA regulations, thus inducing purchase or lease, and leaving Plaintiff with Defective Vehicles that were of greatly diminished value and/or performance, and/or increased costs.

241.   As a direct and proximate result of Chrysler's breach of contract, Plaintiff and the other Class members are entitled to legal and equitable relief against Chrysler, including but not limited to, damages, incidental and consequential damages, attorneys' fees, costs of suit, and other relief as appropriate.

## COUNT XII

## VIOLATION OF THE NORTH CAROLINA UNFAIR AND DECEPTIVE TRADE PRACTICES ACT

### (N.C. Gen. Stat. §75-1.1, *et seq.*)

### (On Behalf of the North Carolina Class Against All Defendants)

242.   Plaintiff incorporates all allegations made in ¶¶1-85.

243.   Plaintiff and the North Carolina Class members are persons under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §75-1.1, et seq. ("NCUDTPA").

244.   Defendants' acts and practices complained of herein were performed in the course of Defendants' trade or business and thus occurred in or affected "commerce," as defined in N.C. Gen. Stat. §75-1.1(b).

245.   The NCUDTPA makes unlawful "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]"  The NCUDTPA provides a private right of action for any person injured "by reason of any act or thing done by any other person, firm or corporation in violation of" the NCUDTPA.  N.C. Gen. Stat. §75-16.

246.   Defendants intentionally and knowingly misrepresented material facts regarding the Defective Vehicles with intent to mislead Plaintiff and the North Carolina Class.

247.   Defendants owed Plaintiff and the North Carolina Class Members a duty to disclose, truthfully, all the facts concerning the cleanliness, efficiency and reliability of the Defective Vehicles and the devaluing of safety, integrity and lawfulness at Defendants, because Defendants:

(a)     Possessed exclusive knowledge that they valued cost-cutting over environmental cleanliness, efficiency, and lawfulness, and that they were

manufacturing, selling, and distributing vehicles throughout the United States that did not comply with EPA regulations;

(b)     Intentionally concealed the foregoing from Plaintiff; and/or

(c)     Made incomplete or negligent representations about the environmental cleanliness and efficiency of the Defective Vehicles generally, and the use of the defeat device in particular, while purposefully withholding material facts from Plaintiff that contradicted these representations.

248.   Defendants' acts and practices as discussed throughout this Complaint were unfair or deceptive acts that are unlawful in violation of the NCUDTPA for, *inter alia*, one or more of the following reasons:

(a)     Defendants designed and secretly installed the defeat device with the intention of deceiving regulators and the public;

(b)     Defendants represented that the Defective Vehicles had approval, characteristics, uses, and benefits that they do not have;

(c)     Defendants provided and otherwise distributed false and misleading information to consumers regarding the legality of the Defective Vehicles, their true emissions characteristics, and performance;

(d)     Defendants represented that the Defective Vehicles were of a particular standard, quality, or grade, when they were of another;

(e)     Defendants engaged in unconscionable commercial practices in failing to reveal, and intentionally concealing, material facts and information about the Defective Vehicles, which misled Plaintiff and the North Carolina Class;

(f)     Defendants failed to reveal, and intentionally concealed, facts about the Defective Vehicles that were material to the transaction and which they intended that Plaintiff and members of the North Carolina Class would rely on.

249.   Defendants committed these and other unfair and deceptive acts with regard to the marketing and sale and/or lease of the Defective Vehicles.

250.   Defendants knew that the Defective Vehicles contained the defeat device designed to deceive regulators and the public.

251.   Defendants' concealment and/or failure to warn that the Defective Vehicles contained the defeat device constitutes an unfair, unconscionable, or deceptive act within the meaning of the NCUDTPA.

252.   The unfair, unconscionable, and deceptive acts committed by Defendants caused damages to Plaintiff and North Carolina Class members.  Plaintiff and the North Carolina Class members have lost money or property by purchasing or leasing the Defective Vehicles which they otherwise would not have done, or paid a premium, which they otherwise would not have paid, and the Defective Vehicles have suffered a diminution in value, and any fix would result in increased fuel and efficiency costs, and decreased performance.

253.   Plaintiff, individually and on behalf of the other North Carolina Class members, seeks treble damages pursuant to N.C. Gen. Stat. §75-16, and an award of attorneys' fees pursuant to N.C. Gen. Stat. §75-16.1.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of members of the Class, respectfully requests that the Court enter judgment in his and the Class's favor and against Defendants, as follows:

(a)   Certification of the proposed Nationwide Class, Michigan Class, and/or North Carolina Class, including appointment of Plaintiff's counsel as Class Counsel;

(b)   An order permanently enjoining Defendants from continuing the unlawful, deceptive, fraudulent, and unfair business practices alleged in this Complaint;

(c)   Injunctive relief in the form of a buy-back program, recall, and/or reimbursement of the Defective Vehicles purchases;

(d)   Costs, restitution, damages, including treble and/or punitive damages, and disgorgement in an amount to be determined at trial;

(e)   Any applicable statutory and civil penalties.

(f)   Pre- and post-judgment interest on any amounts award;

(g)   An award of costs and attorneys' fees; and

- 75 -

(h)     Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial for all claims so triable.

DATED:  December 23, 2016          THE MILLER LAW FIRM P.C.

 /s/  *E. Powell Miller*  (P39487)
E. POWELL MILLER (P39487)
SHARON S. ALMONRODE (P33938)
950 West University Dr., Suite 300
Rochester, MI  48307
Telephone:  248/841-2200
248/652-2852 (fax)
epm@millerlawpc.com
ssa@millerlawpc.com


ROBBINS GELLER RUDMAN
  & DOWD LLP
PAUL J. GELLER
MARK J. DEARMAN
STUART A. DAVIDSON
JASON ALPERSTEIN
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
pgeller@rgrdlaw.com
mdearman@rgrdlaw.com
sdavidson@rgrdlaw.com
jalperstein@rgrdlaw.com

HAGENS BERMAN SOBOL SHAPIRO LLP
HAGENS BERMAN
STEVE W. BERMAN
JERROD C. PATTERSON
1918 Eighth Avenue, Suite 3300
Seattle, WA  98101
Telephone:  206/623-7292
206/623-0594 (fax)
steve@hbsslaw.com
jerrodp@hbsslaw.com

BARRETT JOHNSTON MARTIN &
    GARRISON, LLC
JERRY E. MARTIN (No. 20193)
DAVID W. GARRISON (No. 24968)
SETH M. HYATT (No. 31171)
Bank of America Plaza
414 Union Street, Suite 900
Nashville, TN  37214
Telephone:  615/244-2202
615/252-3798 (fax)
jmartin@barrettjohnston.com
dgarrison@barrettjohnston.com
shyatt@barrettjohnston.com

*Counsel for Plaintiff and the Putative Class*